IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN MATTER OF APPLICATION OF          )
THE UNITED  STATES OF AMERICA       )
FOR A WARRANT DIRECTING THE         )        Magistrate No.  2:24-mj-251
DISCLOSURE OF GPS/E911               )
LOCATION DATA RELATING TO THE  )          **[UNDER SEAL]**
CELLULAR TELEPHONE ASSIGNED     )
CALL NUMBER                               )
**(614) 597-3387**                            )

## AFFIDAVIT IN SUPPORT OF
## A RENEWED APPLICATION FOR A SEARCH WARRANT

I, John Ypsilantis, being duly sworn, depose and say:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this Affidavit in support of an Application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(614) 597-3387,** registered to an Unknown Subscriber, and utilized by Ira ROBERTS (IRA) (hereinafter the **"SUBJECT TELEPHONE"**), which is serviced by **T-MOBILE**, a wireless telephone service provider.

2.    Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the Federal Bureau of Investigation (FBI) and, acting as such, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the United States Attorney General to request a warrant directing the disclosure of GPS/E911 location data.

4. I entered on duty at the FBI Academy in Quantico, Virginia on May 14, 2017. I am currently assigned to the to the FBI Cincinnati Division (Columbus Resident Agency) Southern Ohio Safe Streets Task Force (the "SOSSTF"). I have been assigned to this squad since November 2023. From January 2021 until October 2023, your Affiant was assigned to the FBI Cincinnati Division (Columbus Resident Agency) Joint Terrorism Task Force. From October of 2017 until January 2021, your Affiant was assigned to the FBI Pittsburgh Division Greater Pittsburgh Safe Streets Task Force. I was employed as a U.S. Border Patrol Agent with the Department of Homeland Security (DHS) Customs and Border Protection (CBP) from July 23, 2009, to May 13, 2017. From January 2012 until May 2017 your Affiant was assigned as a full time Task Force Officer (TFO) to the FBI Cleveland Division Organized Crime Task Force.

5. During the course of my employment as an FBI Special Agent, FBI TFO, and U.S. Border Patrol Agent, I have participated in numerous complex criminal, national security, and international and domestic terrorism investigations, as well as investigations of criminal organizations involved in both the manufacturing and distribution of controlled substances. I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances. To successfully conduct these

2

investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recordings, and audio and audio/video recording devices. Additionally, I have personally participated in Title III wiretap investigations, pursuant to 18 U.S.C. § 2516, in the Northern District of Ohio (NDO) and the Western District of Pennsylvania (WDPA).

6.     In addition to the training I received at the FBI Academy and the U.S. Border Patrol Academy, I have received specialized training from the FBI and DHS/CBP focused on topics such as drug interdiction, drug detection, money-laundering techniques and schemes, drug identification, asset identification and removal, and methods utilized by organized criminal enterprises and drug trafficking organizations to carry out the aforementioned criminal conduct.

7.     Through the investigations that I have participated in, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, outlaw motor cycle gangs, street gangs, and prison gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances and/or firearms, and to collect and launder related proceeds.

8.     I know that it is common practice for drug traffickers to routinely utilize telephones (including cellular phones and prepaid phones), calling cards, text messaging, email, social media platforms and applications, encrypted applications, FaceTime, counter surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from law enforcement

detection. It is not uncommon for drug traffickers to initiate such mobile or prepaid telephone service in the name of an associate or family member or in the name of a fictitious individual. Drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds derived from the sale of controlled substances. Moreover, it is not uncommon for drug traffickers to utilize multiple telephone numbers – for instance, a buyer telephone and an associate telephone – as an additional means to avoid law enforcement detection.

9.      Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I am familiar with the coded language and deceptive linguistic practices typically used by drug traffickers. I have spent many hours reviewing and transcribing such coded language, including in preparation for federal indictments and trials. This process of reviewing and transcribing thousands of intercepted communications, in conjunction with my other experience, has confirmed that it is now common practice for drug traffickers to utilize all communication features of their telephones, most notably, the voice call and text message features, nearly simultaneously to communicate with their conspirators. For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages. In fact, it is now quite unusual for a drug trafficker to utilize solely one (1) feature of a telephone, such as the voice call feature, to further his criminal activities while not also using another feature, such as the text message feature, to further their criminal activities.

10.      I have personally participated in the instant investigation, which is an investigation into the criminal activity, including drug trafficking, of individuals who are members and/or

4

associates of the Ira ROBERTS (IRA), ███████████████████ and members and associates of the KONVICTED FAMILY gang, hereinafter the "KF".

11.　This combined Application and Affidavit specifically relates to an ongoing investigation into members and/or associates of the KF, which is a violent street and prison gang, its suppliers and higher-level drug-dealers, including IRA, and others known and unknown, and the ongoing use of the **SUBJECT TELEPHONE**, by IRA, to conspire to distribute and to distribute controlled substances in the Southern District of Ohio, in violation of Title 21, United States Code, Sections 841 and 846 (the "TARGET OFFENSES").

12.　I submit that the following establishes probable cause to believe that the TARGET OFFENSES have been committed and are still being committed by IRA, and that IRA, the user of the **SUBJECT TELEPHONE**, along with others known and unknown, and that the information likely to be received concerning the location of the **SUBJECT TELEPHONE**, which is used by IRA, will constitute evidence of that crime – in that, information about the location of the cellular telephone will be useful in, among other ways, tracking the movements and activities of IRA, continuing to identify the drug trafficking associates of IRA, locating potential stash houses where drugs and drug proceeds are stored and processed, as well as an aid in conducting physical surveillance with less risk of being detected.

## BASIS FOR FACTS/CIRCUMSTANCES CONTAINED IN THIS AFFIDAVIT

13.　The information contained within this Affidavit is derived from my personal knowledge and obtained as a result of my participation in this investigation, as well as from the following sources of information:

　　　a.　Non-consensual and consensually monitored and recorded communications;

b.     Oral and written reports about this and other investigations that I have received, directly or indirectly, from state and local officers and detectives, as well as federal agents and task force officers;

c.     Surveillance that has been reported to me, either directly or indirectly;

d.     Review of telephone subscriber, toll, and pen register trap and trace records and information;

e.     Independent investigations by local law enforcement organizations;

f.     Reports from controlled/undercover drug purchases; and,

g.     Interviews/conversations with confidential sources.

14.     Except where otherwise noted, the information set forth in this Affidavit has been provided to me directly or indirectly by FBI agents, ATF agents, and/or task force officers or local and/or state law enforcement agents/officers.

15.     Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided to me by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Such statements are among many statements made by others, and are stated in substance, unless otherwise indicated.

16.     Similarly, information resulting from surveillance (except where otherwise indicated) does not set forth my personal observations, but rather observations that have been provided directly or indirectly to me through other law enforcement officers who conducted such surveillance.

17.     Whenever I state a belief, that belief is based upon my training and experience, as well as information obtained during this investigation.

18.     Further, I do not rely upon facts not set forth herein in reaching my conclusion that a warrant should be issued, nor do I request that this Court rely upon any facts not set forth herein in reviewing this Affidavit in support of the Application for the disclosure of location data relating to a wireless device.

19.     Because this Affidavit is being submitted for the limited purpose of seeking authorization for disclosure of location data relating to a wireless device, I have not set forth each and every fact learned during the course of this investigation.     Instead, I have set forth only those facts that I believe are necessary to establish the requisite probable cause to support a warrant authorizing the disclosure of location data relating to the **SUBJECT TELEPHONE**.

## FACTS ESTABLISHING PROBABLE CAUSE

20.     This investigation is the result of efforts by the FBI, the Bureau of Alcohol, Tobacco, and Firearms (ATF) Crime Gun Intelligence Center (CGIC) Task Force (TF), Columbus Division of Police (CPD), Franklin County Sheriff's Office (FCSO), and other federal and local law enforcement agencies (LLEA) to investigate and prosecute individuals involved and/or associated with the KF, a violent street and prison gang, which is known by law enforcement to engage in criminal activities related to violence, firearms, and drug trafficking.

21.     KF is a Franklin County, Ohio-based gang that originated at Southeastern Correctional Facility in 2008.     The main membership factor of KF is being from the Franklin County area, which also causes a distinct dynamic because most know each other through familial and/or social ties.     Law enforcement is aware that KF members and associates traffic narcotics in the South Side and West Side neighborhoods of Columbus, Ohio and throughout the greater Columbus, Ohio metropolitan area.     It should also be noted that the majority of known members of KF have been arrested and/or convicted in the past for varying drug violations.     KF members

have also been arrested or convicted in the past for numerous firearm violations, and other violent crimes.

22.     As described within, law enforcement has become aware that IRA and ███████ are currently engaged in narcotics trafficking in the Columbus area.    Moreover, the investigation has indicated that IRA and ████████ are KF members.

23.     IRA has prior drug-related arrests and/or convictions to include: 2005 – Felony Possession of Drugs, and 2008 – Felony Distribution of Cocaine Base.    IRA is also the subject of an ongoing drug trafficking investigation being conducted by FCSO.

24.     ███████ has prior drug or firearms related arrests and/or convictions to include: 2002 – Felony Possession of Cocaine, 2003 – Felony Possession of Cocaine, 2012 – Possession of a Firearm by a Convicted Felon, and 2014 – Felony Possession of Drugs.

25.     A confidential source (hereinafter CS1) has been cooperating with law enforcement for over one (1) year.[1]

26.     Between November 2023 and the present, CS1 was debriefed on numerous occasions.

27.     During these debriefings, CS1 identified IRA and ████████ as members of KF and involved in firearm and drug trafficking activities as well as numerous acts of violence.

28.     CS1 is familiar with IRA and ████████ and has provided both historical and current information on IRA and ███████ and their co-conspirators.

---

[1] CS1 is motivated by the potential for monetary gain as well as a sense of civic duty  Additionally, CS1 has several prior arrests and criminal convictions. However, a detailed list of the charges and dates of arrests and convictions or CS1 will not be included since doing so will likely reveal to IRA, ██████ and their associates the identity of CS1 and thus place CS1's safety in jeopardy. Based upon information provided to me from other agents/officers who had prior conversations with CS1, and based upon the fact that CS1's information was corroborated through other law enforcement means, I believe that the information provided by CS1 relative to the instant investigation is credible.

29.     CS1 identified that the KF gang was started in approximately 2008 as a state prison gang and a violent neighborhood-based street gang with members and associates originally hailing from the South Side and West Side neighborhoods of Columbus, Ohio.

30.     CS1 advised that KF gang members were involved in violence, as well as firearm and drug trafficking activities.

31.     CS1 stated that ███████████ was also known by the street name or alias '██ ██████  Further, ████████ held a leadership role in KF and Gangster Disciples and was a "shot caller."  Additionally, CS1 stated that ████████ was involved in firearm and drug trafficking activities as well as numerous acts of violence.  Specifically, CS1 stated that ████████ trafficked in cocaine, fentanyl, and marijuana on the South Side and West Side of Columbus, Ohio.

32.     CS1 identified ██████████████ Ira ROBERTS, also known by the street name "IRA," a high-ranking Vice Lords and KF gang member.  CS1 stated that IRA was a source of supply for cocaine and fentanyl for KF members to include ████████

33.     CS1 stated that ████████ and IRA had access to kilogram-quantity amounts of cocaine as well as significant quantities of fentanyl and fentanyl-pressed pills known as "fake percs."

34.     CS1 stated that IRA travels to West Virginia and distributes cocaine there.  CS1 further stated that IRA advised CS1 that he (IRA) can make twice the amount of money distributing cocaine in West Virginia than compared to Central Ohio.

35.     CS1 stated that IRA would transport, at the minimum, nine (9) ounces of cocaine when traveling to West Virginia to distribute cocaine.  CS1 stated that IRA routinely traveled in a convoy, used counter surveillance as well as "decoy" cars when transporting cocaine to West

Virginia, in order to insulate himself from law enforcement and potentially disrupt the potential for law enforcement interdiction or detection.

36.     CS1 stated that IRA had been trafficking cocaine in West Virginia for approximately two (2) years that CS1 was aware of.

37.     CS1 stated that IRA owned a car lot in Columbus, Ohio.   CS1 stated that IRA utilized numerous Facebook pages to include the username "YAK IRA" and username "big_latin_folks_m.l.d.n".   CS1 stated that IRA often posted pictures on these accounts in where IRA possessed and displayed large quantities of U.S. currency and expensive jewelry.

38.     CS1 informed law enforcement that IRA utilizes multiple cellular telephones when conducting drug trafficking activities.   (Your Affiant knows from training and experience that narcotics traffickers often use multiple cell phones related to their drug trafficking.)   CS1 identified **SUBJECT TELEPHONE** as one of IRA's current cellular telephones that he utilizes to facilitate drug transactions.   Additionally, CS1 stated that IRA also currently utilizes cellular telephone number (614) 446-1283 to facilitate drug transactions.

39.     CS1 informed law enforcement that ▮▮▮▮▮ utilizes multiple cellular telephones when conducting drug trafficking activities.   CS1 identified ▮▮▮▮▮ previous cellular telephone number as (614) 607-0023.   CS1 further stated that this was ▮▮▮▮▮ cellular telephone that he utilized to facilitate drug transactions prior to his recent incarceration.[2]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

2 Your Affiant is aware that in or around the end of February 2024, ▮▮▮▮ was found to be in violation of his State of Ohio parole conditions and was sentenced to approximately 270 days in state prison.



---

[3] At times, the term "quantity of cocaine" will be utilized in this Affidavit to refer to the cocaine collected during controlled purchases by CS(s) or UC(s). The term is being used for the sole purpose, belief, and fear that if these quantities are mentioned, CS(s) or UC(s) may be identified by IRA, ████████, or their associates. Being identified would subject CS(s) or UC(s) to bodily injury or death.

Your Affiant has reviewed the results of a Drug Identification Report that was provided to your Affiant from the Columbus Division of Police Crime Laboratory, laboratory case number CPCL-2024-01413. The results revealed that the quantities of cocaine collected from the controlled drug purchase operations that occurred on ███████████████████████████████ ested positive for cocaine (hydrochloride form).





45.     Based on your Affiant's training and experience and your Affiant's knowledge of this investigation, it is your Affiant's belief that IRA engages in drug trafficking activity in the ▮▮▮▮▮▮▮▮▮▮ due to IRA being able to sell drugs at a higher price therefore increasing the profitability of his (IRA's) drug trafficking activities.

46.     On January 31, 2024 and February 28, 2024, previous orders authorizing the disclosure of location data for a period of 30 days relating to **SUBJECT TELEPHONE** were signed by magistrate judges in the Southern District of Ohio.   Additionally, on March 27, 2024, a previous order authorizing the disclosure of location data for a period of 45 days relating to **SUBJECT TELEPHONE** was signed by a magistrate judge in the Southern District of Ohio.   It is your Affiant's belief that the continuation or renewal authorizing the disclosure of location data relating to **SUBJECT TELEPHONE** for an additional period of 45 days and the information obtained from that authorization will likely continue to reveal that the target offenses have been committed, are still being committed by IRA, and that IRA, the user of the **SUBJECT TELEPHONE**, along with others, known and unknown, committed that crime, and that the

13

information likely to be received concerning the location of the **SUBJECT TELEPHONE**, which is used by IRA, will constitute evidence of that crime – in that, information about the location of the cellular telephone will continue to be useful in, among other ways, tracking the movements and activities of IRA, continuing to identify the drug trafficking associates of IRA and the KF, locating potential stash houses where drugs and drug proceeds are stored, and drugs are processed as well as an aid in conducting physical surveillance with less risk of being detected.

47.    Cellular telephone subscriber information, toll records, and pen register trap and trace analysis conducted by law enforcement officers involved in the investigation revealed that **SUBJECT TELEPHONE** is currently active.

## CELLULAR DEVICES AND LOCATION DATA

48.    Your Affiant has been advised that **T-MOBILE**, which services the **SUBJECT TELEPHONE**, is a company that provides cellular telephone access to the general public.    Your Affiant also knows that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."    Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.    These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas.    Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.    Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

14

49.     E-911 Phase II data provides relatively precise location information about the cellular telephones themselves, either via GPS tracking technology built into the phones or by triangulating on the device's signal using data from several of the provider's cell towers.

50.     When directed pursuant to court order, **T-MOBILE** will provide a designated law enforcement agency with periodically updated physical location data with respect to the **SUBJECT TELEPHONE**.  If, for any reason, the provider is unable to generate sufficient location information by sending a signal to the **SUBJECT TELEPHONE** or by otherwise using known reference points, the government requests that the provider furnish such other physical location data as is available, including information reflecting the tower and antenna face ("cell site") used by the **SUBJECT TELEPHONE** at the start and end of any call.

51.     Based on your Affiant's training and experience, your Affiant is aware that it is common for members and associates of drug trafficking organizations (DTOs) as well as street and prison gangs to conduct criminal activities across various federal districts throughout the United States due to the scope of their national reach and membership.

52.     Based on your Affiant's training and experience, your Affiant is aware that it is common practice for members and associates of DTOs as well as street and prison gangs to routinely utilize telephones (including cellular phones and prepaid phones), calling cards, text messaging, social media platforms and applications, encrypted applications, FaceTime, email, counter surveillance, false or fictitious identities, and coded communications to communicate with customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from law enforcement detection.   It is not uncommon for members and associates of DTOs as well as street and prison gangs to initiate such mobile or prepaid telephone service in the name of an associate or family member or in the name of a fictitious individual.   Additionally, it is not

15

uncommon for members and associates of DTOs as well as street and prison gangs to change cellular telephone numbers in attempt to thwart law enforcement detection. Members and associates of DTOs as well as street and prison gangs often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds derived from the sale of controlled substances.

53.     Additionally, your Affiant is aware that members and associates of DTOs as well as street and prison gangs often attempt to conceal the coordination and execution of their criminal activities, to include drug and firearm trafficking, through the use of encrypted messaging applications (apps) that can be accessed through "smart" cellular telephones.

54.     Further, your Affiant is also aware that "smart" cellular telephones emit location data during the use of these encrypted messaging apps or communications.

55.     This investigation has established that the information likely to be received concerning the location of the **SUBJECT TELEPHONE** will constitute evidence of that crime. Said information will be useful in, among other ways, tracking the movements and activities of IRA, continuing to identify the drug trafficking associates of IRA, locating potential stash houses where drugs and drug proceeds are stored, and as an aid in conducting physical surveillance with less risk of being detected.

56.     The investigation of IRA, the KF, and others known and unknown is ongoing. The goals of this investigation is to establish and identify the following information:

        a.     The nature, extent, and methods of operation of their illegal drug trafficking;

        b.     The dates, times, places, and manner in which controlled substances are being delivered;

        c.     The identification of other communications facilities used in furtherance of the TARGET OFFENSES;

d.   The methods and means of payment for the controlled substances possessed and distributed and the manner in which these transactions are conducted;

e.   The locations where the controlled substances are stored;

f.   The nature and extent of the mechanisms used to import, transport, and distribute controlled substances within the Southern District of Ohio and elsewhere;

g.   The identities of co-conspirators, accomplices, aiders and abettors, and other participants, and their respective roles and participation in the TARGET OFFENSES; and

h.   Evidence of firearms used in furtherance of the drug trafficking activity and/or crimes of violence.

In doing so, your Affiant and investigators aim to determine the precise manner in which the criminal organization operates, and to dismantle the criminal organization through successful arrests and prosecution of IRA and members of the KF, their associates, their sources of supply, other distributors, and any other co-conspirators assisting the criminal organization. Unfortunately, the goals of the investigation have not yet been fully achieved. Notification of IRA to the disclosure of records and/or physical location data pertaining to the **SUBJECT TELEPHONE** would very likely cause him to, among other things, discard the **SUBJECT TELEPHONE** he is currently using and further fortify and conceal his criminal operation. In doing so, evidence is likely to be lost or never obtained, suspects may flee this jurisdiction, and the safety of informants and law enforcement officers may be placed in danger.

## GOVERNMENT'S REQUESTS

57.   Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

58.   I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until thirty (30) days after the collection authorized by the warrant has been completed. There is

17

reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **SUBJECT TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

59. I further request that the Court direct **T-MOBILE** to disclose to the government any information described in Attachment B that is within the possession, custody, or control of **T-MOBILE**. I also request that the Court direct **T-MOBILE** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with **T-MOBILE's** services, including by initiating a signal to determine the location of the **SUBJECT TELEPHONE** on **T-MOBILE's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate **T-MOBILE** for reasonable expenses incurred in furnishing such facilities or assistance.

60.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **SUBJECT TELEPHONE** outside of daytime hours.

61.     I further request that the warrant apply to any changed telephone number assigned to an instrument bearing the same ESN or IMEI numbers as the **SUBJECT TELEPHONE**, and to any changed ESN or IMEI number assigned to the same telephone number as the **SUBJECT TELEPHONE** within the period of disclosure directed by this warrant, and to any changed ESN or IMEI number assigned to the telephone number or telephone number assigned to the same ESN or IMEI numbers of the **SUBJECT TELEPHONE** if the **SUBJECT TELEPHONE** is ported to another service provider within the period of disclosure directed by this warrant.

## CONCLUSION

62.    Based upon the foregoing, it is respectfully submitted that there is probable cause to conclude that the records and physical location data of the **SUBJECT TELEPHONE** constitute evidence of crimes committed, and being committed, in the Southern District of Ohio.    The records and physical location data will reflect where **SUBJECT TELEPHONE** and certain associates are located when criminal activity occurs and will also reflect, in conjunction with physical surveillance and other investigative steps, those with whom the user of the **SUBJECT TELEPHONE**, IRA, is interacting.

The above information is true and correct to the best of my knowledge, information and belief.

/s/ *John M. Ypsilantis*
JOHN M. YPSILANTIS
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A), this
13th day of May, 2024.



Kimberly A. Jolson
United States Magistrate Judge